THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CATHY MINIX, individually, as            )
the natural guardian of Gregory Zick,    )
and as personal representative of        )
the estate of Gregory Zick; and          )
STEVEN ZICK, individually,               )
                                         )
        Plaintiffs                       )
                                         )
    vs.                                  )        CAUSE NO. 3:05-CV-144RM
                                         )
FRANK CANARECCI, JR., et al.,            )
                                         )
        Defendants                       )

OPINION AND ORDER

Cathy Minix brings suit pursuant to 42 U.S.C. § 1983 as the personal representative of the estate of her deceased son Gregory Zick, alleging the defendants violated Gregory's Eighth and Fourteenth Amendment rights when they failed to prevent his suicide during his detainment at the St. Joseph County Jail. Ms. Minix and Steven Zick also sue on behalf of themselves and Gregory under Indiana's Child Wrongful Death Act, alleging the defendants failed to provide Gregory adequate medical supervision. Two of the defendants, Madison Center Inc. and Christine Lonz, move for summary judgment, and for the reasons that follow, the court grants their motion in part and denies it in part.[1]

_____

[1] In addition to the claims subject to this summary judgment motion, the plaintiffs also allege Gregory was denied privileges and immunities under Article IV § 2 of the United States Constitution. Neither party addresses this claim in their briefing, so this order doesn't address its propriety or existence.

The following relevant facts are recited only for purposes of resolving the summary judgment motion and are taken in the light most favorable to the plaintiffs as legally possible. Gregory Zick committed suicide on April 23, 2003 while being held as a detainee at the St. Joseph County Jail after being arrested while on leave from Richmond State Hospital, where he was a civilly committed inpatient.

The St. Joseph County Jail has written policies and procedures regarding the screening of inmates and detainees for suicide risks. Detainees receive a medical screening upon their arrival, and the jail medical staff assesses detainees designated as possible suicide risks to determine the "lethality and suicide potential." If a detainee presents a risk of suicide or if the jail medical staff suspects that the detainee may be mentally impaired, jail personnel are instructed to contact the Madison Center for an assessment.

The Madison Center and the St. Joseph County Jail have an agreement under which the Madison Center provides outpatient mental health services at the jail on a referral basis. Upon receiving a referral, the Madison Center sends an emergency services counselor such as Christine Lonz to assess the detainee. After conducting the assessment, counselors are required to prepare a written report of their findings. Ms. Lonz testified she would leave her report in the wall pocket of the jail examination room. Counselors could make recommendations on the

monitoring, observation, and handling of a detainee who has been diagnosed as having a psychiatric illness.[2]

Madison Center counselors providing detainee assessments in March 2003, including Ms. Lonz, were subject to the St. Joseph County Jail's policies and procedures on mental health services and screening for suicide risks. The Madison Center had no additional policies or procedures in place at that time, and implemented its own standards about what counselors asked and reviewed for purposes of assessments.

Gregory Zick arrived at the St. Joseph County Jail on March 22. Booking Officer Amanda Parrish prepared a record of arrest and noted that Mr. Zick had self-inflicted scars on his arms and neck. She interviewed him and discovered he was a patient at Richmond State Hospital. She also learned he had suicidal thoughts and had attempted suicide a month earlier. He denied any present

---

[2] The parties dispute the counselors' authority to make detainee housing decisions. The defendants say the jail's policies and procedures only permit counselors to make recommendations, and that the ultimate decision rests with the jail personnel. *See* [Schroeder Deposition 71: 6-10, November 17, 2005]. They say the only individuals with the authority to move a detainee are Nurse Jeanne James, Clinical Supervisor Jim Hall, and other classification officers. *See* [James Deposition 129: 23-25, 130: 18, January 3, 2006] The plaintiffs say Madison Center counselors had the ability to change a detainee's suicide status level, so they could effectively regulate housing. *See* ST. JOSEPH COUNTY JAIL'S POLICIES AND PROCEDURES, Section 4E-34. While the Madison Center counselors' role in detainee housing determinations isn't clear from the record, the court needn't determine the extent of their authority since Ms. Lonz never changed Mr. Zick's suicide status level. Other than Nurse James's testimony that classification officers rely on a counselor's assessment in making housing determinations, there is no evidence to suggest the Madison Center or Ms. Lonz had any part in the decision to transfer Mr. Zick from medical segregation to general population. To the contrary, Ms. Lonz recommended that the "jail staff [ ] monitor [him] and advise if PT [patient] needs to be seen again." Nothing in the record suggests the Madison Center or Ms. Lonz were even aware of any subsequent transfers of Mr. Zick after the initial assessment.

intention of committing suicide. At some point during Mr. Zick's initial classification and booking, he explained that he planned his suicide attempts[3]; Officer Parrish requested an evaluation from the medical staff.

Nurses Laz and Erin evaluated Mr. Zick and told Deputy Belinda Shroeder that he was "not a threat of suicide and could be placed into general population." Still, Deputy Shroeder recommended that Mr. Zick "be housed in the medical segregation, on a suicide watch or be interviewed by a mental health care provider." Classification Officer Rebecca Workman assigned Mr. Zick to a medical cell and a referral was made to the Madison Center. While he was in medical segregation, Mr. Zick's nurses noted that he was "alert, orient x 3" and "rest[ed] quietly." He had no complaints other than a periodic reluctance to take his medicine. He stated that he was "fine" and was doing "O.K."

On March 27, Ms. Lonz met with Mr. Zick to assess his mental health status pursuant to a referral from the jail. She doesn't remember specifically what she asked him, but she testified that she would have asked how he was doing, if he had any problems, whether he was suicidal, and if he had any suicidal intentions or plans. She also said it was routine for her to makes notes of her assessments which would be entered into the Madison Center computer system. Ms. Lonz's entry for Mr. Zick states, "pt [patient] denies si [suicide] thoughts,

---

[3] It is unclear to whom Mr. Zick made this comment. Officer Parrish's record of arrest doesn't mention this, but on Mr. Zick's primary classification form there is a hand written note that "I spoke with detainee he states he plans out his suicide attempts."

feelings [or] intent."[4] Ms. Lonz also testified that she didn't believe Mr. Zick was on suicide watch when she assessed him, and that he was polite and cooperative. She says a nurse accompanied her during the assessment, but can't remember which one. Nurse James testified that she sometimes sat in with Madison Center counselors during their assessment, but didn't supervise them. She says she didn't sit in with Ms. Lonz during Mr. Zick's assessment.

Before making assessments of inmates or detainees, Ms. Lonz generally researched several factors including (1) their background, (2) whether they were on medication, and (3) the name of the prescribing medical professional. Afterwards, she would advise the accompanying jail nurse of her findings and if there with a medication issue, she would staff with a doctor. For Mr. Zick's assessement, Ms. Lonz didn't talk to any of the nurses or guards, didn't staff with a doctor, and didn't review his medical chart or the medications he had been prescribed. She recommended that the jail staff continue to monitor Mr. Zick and that she should be contacted if they needed her to see him again.

Mr. Zick remained in medical segregation for three days after his meeting with Ms. Lonz, until Nurse James prepared and signed an inmate movement request. She recommended that the classification department move Mr. Zick from medical segregation into the general population because he "no longer need[ed] medical observation; denies suicidal tendencies." Nurse James testified that Ms.

---

[4] After entering her progress report notes in the computer system, Ms. Lonz testified she left the original in the wall pocket in the exam room at the jail, and her copy of the notes was shredded in the ordinary course of business.

Lonz's assessment is something that would have been considered in the decision to move Mr. Zick to general population.

About a month later, on the morning of April 21, Mr. Zick refused to take his psychotropic medication. Deputy Michael Roberts also noticed that a blade from Mr. Zick's razor was missing. When the nurses asked Mr. Zick what happened to the blade, he said someone else took it. Based on these observations, Deputy Roberts prepared and executed an inmate movement request, explaining "I/M [inmate] was moved to medical padded cell after finding cuts on inmate and he had removed the blade from his razor." The record doesn't suggest the Madison Center or Ms. Lonz were made aware of Mr. Zick's behavior or the transfer to medical segregation.

After two days of observation, Mr. Zick was again released from medical segregation. Nurse James explained in the inmate movement request that he "[n]o longer needs medical observation." The decision to return Mr. Zick to general population was made because the medical staff determined the scars Deputy Roberts had noticed weren't fresh, and that he hadn't recently attempted suicide. Deputy Schroeder executed the inmate movement request on April 23. Mr. Zick was found dead in his cell later the same day. The record doesn't suggest the Madison Center or Ms. Lonz were made aware of Mr. Zick's return to general population.

Ms. Lonz holds a bachelor's degree in human services administration and an associate's degree in human services. The focus of her studies was on

community mental health, social work, family dynamics, crisis intervention, and substance abuse. She also took classes in psychology and sociology, but none of her additional courses dealt with mental health treatment. She isn't licensed to administer prescription drugs and hasn't taken courses in pharmacology.

Before Ms. Lonz began making assessments at the St. Joseph County Jail, she had worked in the Madison Center's community support program, where she helped link out-patients to community services. She then worked in the emergency services department, where she made patient assessments. She received no additional training for assessing inmates or detainees, but had experience with suicidal patients while working at the Madison Center and during her previous employment.

The defendants say they are entitled to a judgment as a matter of law on the plaintiffs' constitutional claims. They also ask the court to relinquish its supplemental jurisdiction over the plaintiffs' state law claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving

party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting Schacht v. Wisconsin Dep't of Corr.,175 F.3d 497, 504 (7th Cir. 1999)).


CHRISTINE LONZ

The plaintiffs say Ms. Lonz, through deliberate indifference to Mr. Zick's risk of suicide, violated his Eighth and Fourteenth Amendment rights to receive adequate medical supervision and care during his confinement. See Farmer v. Brennan, 511 U.S. 825, 832-834 (1994) (the Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate food, clothing, shelter, and medical care, and requires that officials "take reasonable measures to guarantee the safety of the inmates"); Board v. Farnham, 394 F.3d 469, 477-478 (7th Cir. 2005) ("the constitutional rights of a pretrial detainee are derived from

8

the Due Process Clause of the Fourteenth Amendment ...”); <u>Matos ex rel. Matos</u> <u>v. O'Sullivan</u>, 335 F.3d 553, 556 (7th Cir. 2003); <u>Sanville v. McCaughtry</u>, 266 F.3d 724, 733 (7th Cir. 2001); <u>Estate of Cole by Pardue v. Fromm</u>, 94 F.3d 254, 258 (7th Cir. 1996). Although the Eighth Amendment doesn’t apply to pretrial detainees such as Mr. Zick, pretrial detainees are entitled to as least as much protection under the Fourteenth Amendment as convicted prisoners are under the Eighth Amendment. <u>Board v. Farnham</u>, 394 F.3d at 477-478. Indeed, the court of appeals has "found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) 'without differentiation.' " <u>Id</u> at 478, (quoting <u>Henderson v. Sheahan</u>, 196 F.3d 839, 845 n.2 (7th Cir. 1999). Therefore, the court will analyze this case under Eighth Amendment standards.

To succeed on a § 1983 claim based upon a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element: (1) the harm that befell the inmate or detainee was objectively, sufficiently serious, and a substantial risk to his health or safety, and (2) that the defendant was deliberately indifferent to the inmates or detainee’s health and safety. <u>Collins v.</u> <u>Seeman</u>,462 F.3d 757, 760 (7th Cir. 2006) (citing <u>Farmer v. Brennan</u>, 511 U.S. at 834). The parties don’t dispute that the first prong is satisfied “since suicide is an objectively serious harm.” <u>Matos ex rel. Matos v. O'Sullivan</u>, 335 F.3d at 557. At issue is whether Ms. Lonz was deliberately indifferent to the risk that Mr. Zick would commit suicide.

Where the harm at issue is a suicide, deliberate indifference requires a showing that the defendant (1) subjectively knew the inmate or detainee was at substantial risk of committing suicide, and (2) intentionally disregarded the risk. Collins v. Seeman, 462 F.3d at 761 (citing Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557); *see also* Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d 525, 529 (7th Cir. 2000). For the subjective component, "it is not enough that there was a danger of which a prison official should have been aware," rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exist, and he must also draw the inference." Collins v. Seeman, 462 F.3d at 761 (quoting Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 529). Liability doesn't attach where "the defendants simply were not alerted to the likelihood that the [detainee] was a genuine suicide risk." Id. (quoting Boncher ex rel. Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001)). A plaintiff may establish subjective awareness of the risk by proof of the risk's obviousness. Estate of Cole by Pardue v. Fromm, 94 F.3d at 260.

The summary judgment record contains no evidence that Ms. Lonz had actual knowledge that Mr. Zick was a suicide risk. An official's assessment of an inmate or detainee is "by definition [her] subjective conclusion regarding the risk [he] posed to himself." *See* Estate of Cole by Pardue v. Fromm, 94 F.3d at 261. Ms. Lonz testified that when she assessed inmates and detainees at the St. Joseph County Jail, she would ask them if they were suicidal; specifically whether they had any plans or intent to commit suicide. Her assessment of Mr. Zick was that

10

"pt [patient] denies si [suicide] thoughts, feelings [or] intent." The plaintiffs don't refute this evidence, so no reasonable juror could conclude she was actually aware of his substantial risk of suicide. *See* Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557.

The plaintiffs say Ms. Lonz still was on notice of Mr. Zick's risk of suicide because she "failed to take steps to properly inform herself of the immediacy of that risk." The court cannot agree. While an official cannot deliberately avoid knowledge of a risk that she strongly believes to be present, *see* Higgins v. Correctional Medical Services of Illinois, Inc., 178 F.3d 508, 511 (7th Cir. 1999), failing to review an inmate or detainee's medical history or not conducting a physical exam for self-inflicted wounds doesn't constitute deliberate indifference. *See* Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557. In support of their argument, the plaintiffs rely on Terry v. Rice, 2003 WL 1921818 (S.D. Ind. 2003), in which the court rejected the defendant's argument that his failure to take steps to prevent an inmate's suicide amounted only to negligence. The court found that despite not having actual knowledge that the inmate was a high risk for suicide, the defendant's knowledge that the inmate had twice previously attempted suicide was sufficient to allow a jury to find that he chose to "turn a blind eye toward a known and serious risk."

This summary judgment record contains no evidence to suggest Ms. Lonz was aware of Mr. Zick's prior suicide attempts or that he had self-inflicted injuries. Being mindful of the court's duty to draw all inferences in the plaintiffs' favor, the

11

court can infer no more than that Ms. Lonz should have reviewed Mr. Zick's medical records for prior suicide attempts or conducted a physical examination of Mr. Zick for any self-deprecating wounds. But even this inference is tenuous, given that Mr. Zick repeatedly denied having any suicidal thoughts. Any inference that Ms. Lonz should have been aware of Mr. Zick's risk of suicide "leads only to negligence," Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557, so the court cannot say a reasonable jury could find Ms. Lonz to have been deliberately indifferent to Mr. Zick's medical needs by not informing herself of the risk. *See* Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 529.

The plaintiffs also maintain that a jury could infer that Ms. Lonz was aware that Mr. Zick was a suicide risk because the risk was so obvious. The court cannot agree. The plaintiffs say Mr. Zick's documented mental health history, his scars, a recent institutionalization, and his medication (Paxil, Depacote, and Buspar) made him an individual in obvious need of medical treatment. Again, nothing in the record indicates that Ms. Lonz knew of these things. She knew Mr. Zick had been institutionalized, but without more, the court cannot say the risk is so obvious that a reasonable jury could infer she was subjectively aware Mr. Zick was an imminent suicide risk. *See, e.g.,* Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557-558*;* Bozeman v. Orum, 199 F. Supp.2d 1216, 1231-1232 (M.D. Ala. 2002) (failure to medicate was not deliberate indifference when nurse did not know of mental illness other than past evaluations for mental illness).

12

Even if a jury could reasonably find Ms. Lonz subjectively knew Mr. Zick was a substantial and imminent risk of suicide, no evidence supports an inference that she intentionally disregarded that risk. Deliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." Collins v. Seeman, 462 F.3d at 762 (quoting Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557). The Eighth Amendment requires "something approaching a total unconcern for [the detainee's] welfare in the face of serious risk." Id. (quoting Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992)). In other words, "a defendant with knowledge of a risk need not 'take perfect action or even reasonable action [,] . . . his action must be reckless before § 1983 liability can be found.' " Id. (quoting Cavalieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003)). Deliberate indifference can be inferred where the defendant's treatment decision was a substantial departure from accepted professional practice. Sanville v. McCaughtry, 266 F.3d at 734; Estate of Cole by Pardue v. Fromm, 94 F.3d 261-262. A plaintiff can show that a  professional disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998).

 Based upon her assessment of Mr. Zick, Ms. Lonz recommended that the Jail medical staff "monitor and advise her if he needed to be seen again." The plaintiffs say Ms. Lonz cannot escape liability even if she didn't make the decision

13

to return Mr. Zick to general population, because the eventual decision to transfer him was based in part on her assessment. The court cannot agree. Even to the extent any of the decisions to reclassify Mr. Zick were based on improper assessment by Ms. Lonz, there is nothing about her conduct from which a jury could infer she intentionally disregarded a known, imminent suicide risk.

Nor can her failure to review Mr. Zick's medical history as part of her assessment and recommendation be found to be "such a substantial departure form accepted professional judgment, practice, or standards" as to show she was deliberately indifferent. Estate of Cole by Pardue v. Fromm, 94 F.3d at 261-262. The plaintiffs submit the affidavit of Dr. Peter E. Gutierrez, who claims Ms. Lonz "failed to meet the appropriate standard of care for reasonably prudent medical professionals in providing care to Gregory Zick," and that her "inactions were so egregious that they demonstrate a complete and deliberate indifference." Dr. Gutierrez's statement that Ms. Lonz's conduct amounts to deliberate indifferent is a conclusory assertion that cannot defeat summary judgment. See Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990) (summary judgment is not a place "to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"); Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002), ("It is well-settled that conclusory allegations ... without support in the record, do not create a triable issue of fact."). Notwithstanding Dr. Gutierrez's opinion, it is the court that considers the record to determine whether a trier of fact could conclude Ms. Lonz was deliberately indifferent.

Even assuming that Ms. Lonz should have reviewed Mr. Zick's medical history, her inaction still doesn't rise to the level of deliberate indifference because a reasonable factfinder could not say that no minimally competent professional with her training would have responded under the circumstance the way she did. *See* Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998).[5] When the record is viewed as favorably to the plaintiffs as is reasonable, little from Ms Lonz's interview with Mr. Zick suggests a review of his medical record was needed. She testified that (1) Mr. Zick was polite and cooperative, (2) he denied having suicidal thoughts, feeling, or intent, and (3) that he wasn't on suicide watch at the time of the assessment.  Given the undisputed facts that Mr. Zick denied being suicidal and that he didn't show signs of depression or exhibit strange behavior during his assessment, no rational trier of fact could reasonably infer Ms. Lonz's conduct in assessing him departed so significantly as to establish a total unconcern for his welfare. *See* Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557-558; Sanville v.

---

[5] The plaintiffs say Ms. Lonz's decisions constitute a substantial departure from accepted "professional judgment," but it is unclear whether they argue Ms. Lonz is a medical professional. The plaintiffs spend a significant portion of their response challenging Ms. Lonz's medical qualifications, but cite Dr. Gutierrez's opinion that she failed to meet the appropriate standard of care for "reasonably prudent medical professionals." The court needn't determine whether Ms. Lonz is a medical professional such as "physicians, psychiatrists, and nurses within their area of expertise," because the analysis under the professional judgment standard is comparable to the deliberate indifference standard for other professionals including prison medical personnel: the decision must be such a departure from accepted standards that the person responsible didn't base the decision on such a judgment. Collignon v. Milwaukee County, 163 F.3d at 989. Moreover, the term professional as used under the professional judgment standard isn't confined to medical professionals, but includes a person "competent, whether by education, training or experience, to make the particular decision at issue." Youngberg v. Romeo,457 U.S. 307, 323 n.30 (1982).

<u>McCaughtry</u>, 266 F.3d at 734-737; <u>Estate of Cole by Pardue v. Fromm</u>, 94 F.3d 261-262.

The plaintiffs haven't pointed to enough evidence to allow a rational trier of fact to reasonably infer Ms. Lonz was subjectively aware of Mr.Zick's risk of suicide, or that she intentionally disregarded that risk. Accordingly, the court grants summary judgment on the plaintiffs' Eighth and Fourteenth Amendment claims against Ms. Lonz.

MADISON CENTER

A corporate entity violates an inmate or detainee's constitution rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." <u>Woodward v. Correctional Medical Services</u>, 368 F.3d 917, 927 (7th Cir. 2004) (quoting <u>Payne v. Churchich</u>, 161 F.3d 1030, 1043 (7th Cir. 1998)); <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d at 530.[6] The policy or practice must be the "direct cause" or "moving force" behind the constitutional violation. <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d at 530; *see also* <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978). "That a constitutional injury was caused by [an entity] may be shown directly by demonstrating that the policy itself is unconstitutional"

---

[6] The Madison Center admits for purposes of this motion that it was acting under color of state law as a contractor performing certain treatment to inmates and detainees. As such, it is treated the same as a municipality for purpose of § 1983. *See* <u>Woodward v. Correctional Medical Services</u>, 368 F.3d at 927 n. 1.

or "indirectly by showing a series of bad acts and inviting the court to infer from them that the policymaking level of [the entity] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." Id. (quoting Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995)). Deliberate indifference to an inmate or detainee's medical needs may also be proven by showing "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." Holmes v. Sheahan, 930 F.2d 1196, 1200 (7th Cir. 1991).

The plaintiffs say there is evidence that the Madison Center was on notice that "the number and length of the visits at the jail, made by [its] personnel, were insufficient to fully address the inmate's needs," and that it can inferred from its inaction to correct these inadequacies that it "sanctioned [ ] behavior and [ ] conditions at the jail all in derogation of Mr. Zick's constitutional rights." In support of their argument, they present the deposition testimony of Sheriff Canarecci, Jr., who testified that he believed Mr. Twardos, the administrator of the Madison Center's agreement with the Jail, was aware before Mr. Zick's death of a concern the medical staff had regarding the number and length of the visits performed by Madison Center counselors.[7]  This belief, he explained, was based

_____

[7] The plaintiffs move to supplement the summary judgment record with Sheriff Canarecci's deposition. The defendants respond by moving to strike the supplemental response and materials, asserting that the response (1) is prejudicial in that it raises new arguments, (2) doesn't present

upon a meeting with Mr. Twardos at the Jail's conference room where Sheriff Canarecci asked him for a printout of the number of inmates the Madison Center assessed and the treatment provided.  Although Sheriff Canarecci is unsure of the exact date of this meeting, he believes it took place before Mr. Zick's death.[8] Viewing this testimony in the light most favorable to the plaintiffs, it can reasonably be inferred that Mr. Twados was aware of a concern regarding the number and duration of the Madison Center's visits.

That Mr. Twardos was aware of the Jail staff's concern regarding assessment visits, however, doesn't show a pattern of conduct or a series of acts violative of constitutional rights from which deliberate indifference can be inferred. Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 531 ("In the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiffs must show that the policy itself is unconstitutional."). The plaintiffs haven't shown there was a pattern of suicide at

_____

a meritorious argument because there isn't testimony regarding a meeting before Mr. Zick's death, and (3) the evidence isn't competent since Sheriff Canarecci lacked familiarity with the Madison Center's assessment of Mr. Zick. Because the defendants are still entitled to summary judgment on the Eighth and Fourteenth Amendment claim even when the supplemental response is considered, the court denies their motion to strike, and considers Sheriff Canarecci's testimony in opposition, and for purposes of this summary judgment only.

[8] Sheriff Canarecci initially testified he was present at two meetings before Mr. Zick's death: one in Mr. Agostino's office and one in the Jail's conference room.  Upon reviewing his calendar, Sheriff Canarecci confirmed that the meeting in Mr. Agostino's office took place on May 15, 2003, a month and a half after Mr. Zick's death. Nothing in his deposition testimony contradicts his initial statement that the conference room meeting took place before Mr. Zick's death. Indeed, he testified that he is unsure of the date, but that it took place before the May 15 meeting. When this testimony is viewed in the light most favorable to the plaintiffs, a reasonable inference can be drawn in their favor that the meeting in the Jail's conference room took place before Mr. Zick's death.

the St. Joseph County Jail from which the court can draw the inference that the Madison Center was aware that a lack of procedures was creating a risk for suicide. Nor do they point to any evidence of Madison Center personnel engaging in widespread conduct violative of detainees' constitutional rights. *See* Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003) (two incidents of unconstitutional conduct too few to establish widespread practice). At most, Sheriff Canarecci's testimony suggests that the Madison Center may have been negligent in continuing to implement its current assessment procedures, but negligence will not support a claim for municipal liability under § 1983. Hirsch v. Burke, 40 F.3d 900, 905 (7th Cir. 1994) (citing City of Canton v. Harris, 489 U.S. 378, 391-392 (1989)). Because the plaintiffs haven't presented evidence of any previous constitutional violations, there isn't sufficient evidence from which the Madison Center's liability may be inferred. Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 532 n.3.

The plaintiffs also say the Madison Center was deliberately indifferent as to Gregory's medical needs because of its systemic and gross deficiencies in procedures for the treatment of mentally ill inmates and detainees and the screening for suicide risks. The court cannot agree.  Ms. Lonz testified that she didn't know of any specific procedures which the Madison Center had in place for handling, supervising, and providing medical care and treatment or for dealing

19

with suicidal detainees. [9]   But the Madison Center's role in providing mental health services at the jail was limited to making assessments of inmates and detainees that had been referred.[10] Indeed, Ms. Lonz testified that her role was to assess inmates and detainees for a possible danger they posed to themselves and others based upon what she observed. In that regard, Madison Center counselors making assessments during spring 2003 were required to adhere to the St. Joseph County Jail's policies and procedures.

Under those policies and procedures, if the Jail medical staff suspected an inmate or detainee to be mentally impaired, they were to notify the Madison Center emergency intake and request an evaluation. For the assessment of inmates and detainees, Madison Center counselors weren't provided a list of questions they were required to ask, but Ms. Lonz testified that she had been trained to make assessments of mentally ill individuals, including suicidal patients, and that during her evaluation she inquired into the detainees' background, whether they were suicidal or homicidal, or if they planned to harm themselves. In accordance with the Jail's policies and procedures, Madison Center

---

[9] During her deposition, Ms. Lonz was asked, "[i]n March and April of 2003, were there any policies or procedures in place that direct you as to what you were to do to assess one of the inmates at the jail when you went there?" She responded, "I'm not understanding what you're asking." At this point, counsel for the plaintiffs explained that his question was in reference to the plaintiffs' interrogatories numbers four and five directed to the Madison Center. Upon reading the interrogatories, Ms. Lonz responded "I don't know of any specific procedures."

[10] The Madison Center's overall role in providing mental health services for inmates was more extensive. Under its agreement with the county, it was to plan and finance a hospital facility to provide in-patient and out-patient psychiatric and psychological services for inmates referred by the County. Its role in providing these additional services isn't at issue and so not addressed in resolving the summary judgment motion.

counselors were required to provide the Jail medical staff with a written report of their findings following their evaluation. Mr. Lonz also testified that she would inform the nurses of her assessment, leave her written progress notes for the medical staff, and would staff with a doctor following an assessment, particularly if there was a medication issue. She said Madison Center counselors were also permitted to make recommendations as to the monitoring, observation, and handling of an inmate who has been diagnosed as having a psychiatric illness. Even when viewing the evidence in a light most favorable to the plaintiffs, the court cannot say the Madison Center, in providing mental health assessments, had systemic and gross deficiencies in staffing, facilities, equipment, or procedures that Mr. Zick was effectively denied access to adequate medical care.

Finally, the plaintiffs argue the Madison Center was deliberately indifferent by failing to hire qualified mental health professionals and by failing to train and supervise its employees. The court cannot agree. The parties dispute whether Ms. Lonz is a "qualified health professional," but the court needn't determine the extent of Ms. Lonz's licensing since deliberate indifference standard can't be met by "merely showing that hiring officials engaged in less than careful scrutiny of the applicant resulting in a generalized risk of harm," rather, "the standard 'requires a strong connection between the background of the particular applicant and the specific constitutional violation alleged.' " J.H. ex rel. Higgin v. Johnson, 346 F.3d 788, 794 (7th Cir. 2003) (quoting Kitzman-Kelley v. Warner, 203 F.3d 454, 459 (7th Cir. 2000)). Ms. Lonz holds several degrees and has studied

community mental health, social work, family dynamics, crisis intervention, substance abuse, psychology, and sociology. She had previously made patient assessments while working at the Madison Center and had experience dealing with suicidal patients. Nothing before the court suggests that Ms. Lonz's alleged lack of education or experience with inmates or detainees is strongly connected to Mr. Zick's suicide. Accordingly, the court grants summary judgment on the plaintiffs' Eighth and Fourteenth Amendment claims against the Madison Center.

STATE LAW CLAIMS

The defendants request that the court relinquish supplemental jurisdiction over the plaintiffs' state law claims against them if summary judgment is entered on the Constitutional claims. The court declines to do so, given that a federal claim arising out of the same set of facts as the state law claims continues to pend against the Madison Center and Ms. Lonz. *See* FED. R. CIV. P. 1367(c); *see also* Groce v. Eli Lilly & Co., 193 F.3d 496, 500-501 (7th Cir. 1999).The plaintiffs' complaint alleges the defendants conduct constitutes violations of "the United States Constitution, Article IV, § 2, in that Gregory Zick was denied privileges and immunities granted to all citizens of the United States." Although the defendants' motion seeks summary judgment "on all federal claims,"  neither party addresses this claim in their briefing. It is unclear whether the plaintiffs have abandoned it, but because the defendants haven't met their burden of informing a court of the basis for their motion or demonstrating that they are entitled to a judgment as a

matter law on this claim, summary judgment is inappropriate at this time. FED. R. CIV. P 56(C); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The court continues to exercise supplemental jurisdiction over the state law claims.

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART the defendants' motion for summary judgment [Doc. No. 67]. The motion is GRANTED with respect to the plaintiffs' claim the defendants violated Gregory's Eighth and Fourteenth Amended rights. The motion is DENIED insofar as the defendants ask that the court relinquish supplemental jurisdiction over the state law claims. The court also GRANTS the plaintiffs' motion to supplement their response [Doc. No 82] and DENIES the defendants' motion to strike the supplemental materials [Doc. No. 83]. Several claims continue to pend against Ms. Lonz and the Madison Center and the clerk shall enter judgment accordingly.

SO ORDERED.

Entered: November 1, 2006


_____/s/ Robert L. Miller, Jr._____
Chief Judge
United States District Court


cc: counsel of record