UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CATHY MINIX, individually, as )
the natural guardian of Gregory Zick, )
and as personal representative of )
the estate of Gregory Zick; and )
STEVEN ZICK, individually, )
                                    )
            Plaintiffs              )
                                    )
      vs.                           )      CAUSE NO. 3:05-CV-144 RM
                                    )
FRANK CANARECCI, JR., et al.,       )
                                    )
            Defendants              )

OPINION AND ORDER

Cathy Minix brings suit pursuant to 42 U.S.C. § 1983 as the personal

representative of the estate of her deceased son Gregory Zick, alleging that the

defendants deprived Gregory of certain privileges and immunities (Counts II and

III), as well as certain rights under the Eighth and Fourteenth Amendments

(Count III) when they failed to prevent his suicide during his detainment at the St.

Joseph County Jail. Ms. Minix and Steven Zick also allege that the defendants

violated their constitutionally protected right to the continued companionship of

Gregory (Counts IV and VII). The plaintiffs also bring claims under Indiana law

(Counts V and VI).[1]

---

[1]The St. Joseph County employees sued in their individual capacity (to whom the court collectively refers to as the County defendants) include: Sheriff Canarecci, Warden Grah, Sergeant Johnson, Corporal Van Schoiak, Deputy Workman, Deputy Schroeder, Deputy Blanton, Deputy Kovach, Deputy Clifton, Officer Kizer, Officer Williams, Officer Huber, Officer Orr, and Officer Hahn. The Memorial Home Care employees sued in their individual capacity (to whom the court collectively refers to as the Memorial defendants) include: Dr. David, Nurse James, Nurse Kirchner, Nurse Conn, Nurse Adams, Nurse Gore, Nurse Erin, and Nurse Laz. Ms. Minix has also sued

The Memorial defendants, Madison Center, and Christine Lonz moved for judgment on the pleadings as to the claims against them. The court granted their motion with respect to Ms. Minix's privileges and immunities claims, her Eighth Amendment claim, Steven Zick's claim for loss of companionship, and the constitutional claims against Memorial Home Care, to extent those claims were based upon vicarious liability.[2] The court declined to address the sufficiency of the remaining claims in light of the Supreme Court's holding in <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007). The parties have since filed supplemental briefs to the motion for judgment on the pleadings, and the County defendants and Memorial defendants have also moved for summary judgment. The court now addresses these pending dispositive motions.

MOTION FOR JUDGMENT ON THE PLEADINGS

The court applies the same standard in considering a motion for judgment on the pleadings under Rule 12(c) as a motion to dismiss for failure to state a claim under Rule 12(b)(6). <u>Forseth v. Village of Sussex</u>, 199 F.3d 363, 368 n.6 (7th Cir. 2000). Both motions challenge the complaint's sufficiency, not its underlying merits, <u>Northern. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend</u>, 163 F.3d

---

Sheriff Canarecci, Warden Grahl, Dr. David, and Nurse James in their official capacities, as well as Memorial Home Care and Madison Center (to whom the court collectively refers to as the Municipal defendants). The plaintiffs has also sued Madison Center employee Christine Lonz.

[2]Although the County defendants didn't join in the motion for judgment on the pleadings, dismissal of these claim against them is still warranted because the claims against them are identical and suffer from the same deficiencies. *See, e.g.,* <u>Barnes v. District of Columbia</u>, 2007 WL 1655868, at * 1 n.2 (D. D.C. June 6, 2007); <u>Bennett v. Stephens</u>, 1989 WL 17751, at *5 (D. D.C. February 29, 1989).

449, 452 (7th Cir. 1998), and the court accepts all well-pleaded allegations in the petition as true and draws all reasonable inferences in the plaintiffs' favor. <u>Hentosh v. Herman M. Finch Univ. of Health Sciences/The Chicago Medical School</u>, 167 F.3d 1170, 1173 (7th Cir. 1999). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1964.

A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 1974. In other words, a plaintiff needn't plead detailed factual allegations, but his "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." <u>Id.</u> at 1965 (citations and footnote omitted).

Ms. Minix alleges in Count I that "[t]he wrongful conduct of all defendants [ ] constitutes violations, under the color of state law, of Title 42 § 1983, in that, with deliberate and callous indifference, Gregory Zick was deprived of his rights, privileges, and immunity secured to him by the Constitution and laws of the United States." The Memorial defendants say Count I should be dismissed because Minix hasn't alleged a specific constitutional violation under Count I, and

the "plausible standard" makes it improper for the court to assume that plaintiffs can prove the defendants "violated laws they did not plead."

The court doesn't read <u>Bell Atlantic Corp. v. Twombly</u> so broadly. That case clarifies the factual matter required to show "plausible entitlement to relief," but the Supreme Court indicated no intent to completely depart from a "notice pleading" standard under Federal Rule 8. <u>Bell Altlantic Corp. v. Twombly</u>, 127 S. Ct. at 1964; *see also* <u>Erickson v. Pardus</u>, 127 S. Ct. 2197, 2200 (U.S. 2007); <u>Iqbal v. Hasty</u>, --- F.3d ----, 2007 WL 1717803 * 11 (2nd Cir. June 20, 2007). Count I alleges that the defendants were deliberately indifferent to Gregory's constitutional rights while he was being held as a pretrial detainee. This statement tells the defendants what they have been accused; paragraphs 21, as well as 68 through 82 have been incorporated by reference, and as discussed below, contain the factual allegations supporting this statement of liability. This is sufficient under the "plausible standard" of <u>Bell Atlantic Corp. v. Twombly</u>. *See* <u>Erickson v. Pardus</u>, 127 S. Ct. at 2200. Nevertheless, the Memorial defendants are entitled to judgement on Count I because an allegation that Gregory was treated with deliberate indifference while in custody as a pretrial detainee is viewed under the analytic framework of the Due Process Clause of the Fourteenth Amendment, <u>Payne for Hicks v. Churchich</u>, 161 F.3d 1030, 1039-1040 (7th Cir. 1998), so Count I is duplicative of Count III. *See, e.g.,* <u>Falcon Associates, Inc. v. City of O'Fallon, Ill.</u>, 867 F. Supp. 778, 780 (S.D. Ill. 1994) (dismissing § 1983 claim again municipality as duplicative).

4

In Count III, Ms. Minix alleges violations of the Due Process and Equal Protection Clauses the Fourteenth Amendment. She says the defendants' deliberately indifferent conduct deprived Gregory of due process. To succeed on this claim, Ms. Minix eventually will need to satisfy both an objective and subjective element: (1) the harm that befell Gregory was objectively, sufficiently serious, and a substantial risk to his health or safety; and (2) that the defendants were deliberately indifferent to his health and safety. Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). The Memorial defendants say the factual allegations supporting Ms. Minix' purported due process claim don't meet the "plausible standard," because she hasn't alleged "any facts suggesting that Mr. Zick's treatment amounted to such a substantial departure from accepted professional judgment that his treatment decisions were not based on that judgment." The court disagrees.

The plaintiffs' amended complaint states that the Memorial defendants were responsible for providing medical treatment to Gregory, and that despite being aware of his "suicidal tendencies and prescription needs," as well as his "obvious medical and psychiatric needs," they "failed to properly diagnose and provide appropriate medical care" and "wrongfully plac[ed] him in [a] disciplinary, lock down cell" without the attending physician assisting in his treatment. The plaintiffs' complaint also alleges that several Memorial nurses discovered Gregory in his cell and delayed in providing emergency medical treatment. These allegations (if true) set forth a claim that the Memorial defendants were

5

deliberately indifferent to Gregory's serious medical needs that is plausible on its face. *See* Erickson v. Pardus, 127 S. Ct. at 2200. Whether Ms. Minix can show Gregory's treatment actually amounts to a substantial departure from the accepted professional judgment standard is a question that should be answered at summary judgment after the completion of discovery, and not at the pleading stage. *See* Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965 ("Asking for plausible grounds to infer [an element or claim] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim or element].").

Still, several of the Memorial Home Care employees say they are entitled to judgment on the pleadings as to the claims they were deliberately indifferent because there isn't any allegation they were present at the St. Joseph County Jail on the day of his suicide, or that they were otherwise involved in the deprivation of his constitutional rights. The court disagrees. Paragraphs 68 through 76 of the amended complaint provide sufficient factual matter to establish a plausible claim that these employees were involved in Gregory's medical treatment, so it is beyond speculation that they participated, to some extent, in the alleged constitutional deprivation.

Memorial Home Care says there aren't sufficient allegations that it is constitutionally liable in a municipal capacity for an alleged failure to implement suicide prevention policies and train and supervise its employees. The court again disagrees. In paragraph 21, Ms. Minix says Memorial Home Care (among others)

6

was "responsible for screening, hiring, training, and supervision of all employees and/or agents responsible for medical care of those inmates and detainees." In paragraph 80, she says Memorial Home Care "deliberately, and with conscious indifference, failed to properly train and supervise their employees." The complaint also states that Dr. David, allegedly an agent of Memorial Home Care sued in his official capacity, had "supervisory responsibilities," which included the "duty to ensure that all policies and procedures, with respect to the medical care and treatment of inmates, were correctly carried out . . . ." These allegations (again, if true) set forth a deliberate indifference claim against Memorial Home Care that is plausible on its face.

Ms. Minix also says Gregory's treatment constitutes a violation of equal protection. The Memorial defendants say they are entitled to judgment on her equal protection claim because she hasn't alleged Gregory was a member of a protected class or that he was subject to any intentional discrimination. Ms. Minix responds by arguing Gregory was treated differently as a "class of one" because of a illegitimate animus and without a rational basis. The law recognizes claims brought by a class of one, although the court of appeals has "acknowledge that it is difficult to succeed with such a claim." Maulding Development, LLC v. City of Springfield, Ill., 453 F.3d 967, 969 (7th Cir. 2006) (quoting McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004)). To succeed on this claim, Ms. Minix will have to show (1) Gregory has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in

7

treatment or the cause of the differential treatment is a totally illegitimate animus toward the Gregory by the defendant. Id. at 970. Nowhere in the amended complaint, however, does Ms. Minix allege (even in a conclusory fashion) that Gregory was intentionally treated differently than other similarly situated inmates. Even if one could infer from the allegations regrading Gregory's medical treatment that he was treated with an illegitimate animus or in an irrational manner, her discrimination claim is still speculative, so judgment on this claim must be entered. Stachowski v. Town of Cicero, 425 F.3d 1075, 1078 (7th Cir. 2005) (apply the "no set of facts" standard on a motion to dismiss)(citing McDonald v. Village of Winnetka, 371 F.3d at 1001).

Alternatively, Ms. Minix's seeks leave to amend the amended complaint to conform to the evidence, which is permitted when issues not originally raised by the pleadings "are tried by express or implied consent of the parties."See FED. R. CIV. P. 15(b).[3] One way parties impliedly agree to an issue not included in the complaint is by addressing the issue at summary judgment. Whitaker v. T.J. Snow Co., 151 F.3d 661, 663 (7th Cir. 1998) ("Because both parties squarely addressed the strict liability theory in their summary judgment briefs, the complaint was constructively amended to include that claim."). There is no evidence in the summary judgment record, however, that the defendants intentionally treated

---

[3]The court notes that the Memorial defendants have filed an objection to Ms. Minix's motion for leave to amend and move to strike certain arguments and exhibits relied upon in opposition to the motion for judgment on the pleadings [Doc. No. 136]. Because the court denies Ms. Minix's motion for leave to amend on other grounds, the Memorial defendants' objection is overruled as moot. The court also didn't consider the arguments or attached exhibits in ruling on the motion for judgment on the pleadings, so the motion to strike is denied as moot.

Gregory differently from other similarly situated inmates, or that they acted for the specific purpose of interfering with Ms. Minix's relationship with him.[4] Any amendment to include these claim would be futile, so the court declines to amend the complaint. Mouser v. Caterpillar, Inc., 336 F.3d 656, 666 (8th Cir. 2003) (holding that "the district court did not abuse its discretion in denying plaintiffs' motion to amend their pleadings to conform to the evidence because the proposed amendment would have been futile").

In Counts IV and VII, Ms. Minix brings suit in her individual capacity, alleging she has been deprived a constitutionally protected interest in the continued familial relationship without due process of law. A parent has a recognized due process interest in the parent-adult child relationship "where the state took action specifically aimed at interfering with that relationship." Russ v. Watts 414 F.3d 783, 788 (7th Cir. 2005) (overruling Bell v. City of Milwaukee "insofar as it recognized a constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an

---

[4]Ms. Minix argues in her response to summary judgment that the defendants denied Gregory equal protection by implementing a policy that classifies inmates as mentally ill and physically ill without a rational basis, and that the classification of Gregory as mentally ill has denied him the fundamental right to be free from cruel and unusual punishment. The gravamen of Ms. Minix's claims is that the Jail staff is better trained to treat the physically ill, so by classifying some detainees as mentally ill, those detainees ultimately receive inadequate treatment. To succeed on either equal protection theory, Ms. Minix must present some evidence that the defendants acted with discriminatory intent. *See* Chavez v. Illinois State Police, 251 F.3d 612, 645-646 (7th Cir. 2001); Schroeder v. Hamilton School Dist., 282 F.3d 946, 951 (7th Cir. 2002)("A plaintiff must demonstrate intentional or purposeful discrimination to show an equal protection violation."). There is no evidence that mentally ill inmates were classified with the purposeful intention of providing them with inadequate treatment. Schroeder v. Hamilton School Dist., 282 F.3d at 951(discriminatory purpose "implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group").

9

incidental result of state action"). The Memorial defendants seek judgment on Ms. Minix's claim for loss of continued familial relationship, but Ms. Minix hasn't responded to this claim in her supplemental brief, so the court assumes she has abandoned it. *See, e.g.,* <u>Gillespie v. City of Indianapolis</u>, 13 F. Supp. 2d 811, 828 (S.D. Ind. 1998). In any event, there isn't any allegation (factual or conclusory) from which it can be inferred the defendants acted for the specific purpose of interfering with Ms. Minix's relationship were her son, so her claim of loss of familial relationship is speculative and judgment on this claim must be entered.

For the foregoing reasons, the Memorial defendants are entitled judgment on Count III, to the extent Ms. Minix alleges a violation of equal protection, and on Counts IV and VII.[5]

MOTIONS FOR SUMMARY JUDGMENT

The County and Memorial defendants also move for summary judgment on Ms. Minix's due process claim. Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the  affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.

---

[5]Again, the County defendants didn't join in the motion for judgment on the pleadings,  but dismissal of these claim against them is still warranted because the claims against them are identical and therefore suffer from the same deficiencies. *See, e.g.,* <u>Barnes v. District of Columbia</u>, 2007 WL 1655868, at * 1 n.2; <u>Bennett v. Stephens</u>, 1989 WL 17751, at *5. To the extent Ms. Minix purports to bring a claim against Ms. Lonz or Madison Center for equal protection or interference with her continue familial relationship with Gregory, her claims are deficient for the same reasons, so Ms. Lonz and Madison Center are also entitled judgment.

Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. <u>Ritchie v. Glidden Co.</u>, 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal." <u>Butts v. Aurora Health Care, Inc.</u>, 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. <u>Lawrence v. Kenosha County</u>, 391 F.3d 837, 842 (7th Cir. 2004); *see also* <u>Johnson v. Cambridge Indus., Inc.</u>, 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events'") (quoting <u>Schacht v. Wisconsin Dep't of Corr.</u>,175 F.3d 497, 504 (7th Cir. 1999)).

The following relevant facts are recited only for purposes of resolving these summary judgment motions and are taken in the light most favorable to the plaintiffs as legally possible. Gregory Zick was booked at the St. Joseph County Jail on March 22, 2003. Booking Officer Amanda Parrish prepared a record of arrest, in which she noted that Gregory had self-inflicted scars on his arms and neck. She interviewed him and discovered he was a patient at Richmond State

Hospital, had suicidal thoughts, and had attempted suicide a month earlier. He denied any present intention of committing suicide. At some point during Gregory's initial classification and booking, he explained that he planned his suicide attempts.[6] Gregory indicated that he was taking Paxil and Depakote; his mother was contacted and she confirmed his medication also included Buspar. Officer Parrish requested an evaluation from the medical staff.

Nurses Laz and Erin evaluated Gregory and told Deputy Belinda Schroeder that he was "not a threat of suicide and could be placed into general population." Still, Deputy Schroeder recommended that Gregory "be housed in the medical segregation, on a suicide watch or be interviewed by a mental health care provider." Classification Officer Rebecca Workman assigned Gregory to a medical cell and a referral was made to the Madison Center. While in medical segregation, Gregory's nurses noted that he was "alert, orient x 3" and "rest[ed] quietly." He had no complaints other than a periodic reluctance to take his medicine. He said he was "fine" and was doing "O.K."  Gregory remained in medical segregation for three days until Nurse James prepared and signed an inmate movement request. She recommended that the classification department move Gregory from medical segregation into the general population because he "no longer need[ed] medical observation; denies suicidal tendencies."

---

[6]To whom Gregory made this comment is unclear. Officer Parrish's record of arrest doesn't mention this. Rather, on Gregory's primary classification form there is a hand written note that "I spoke with detainee he states he plans out his suicide attempts."

About a month later, on the morning of April 21, Gregory refused to take his psychotropic medication. Deputy Michael Roberts also noticed that a blade from Gregory's razor was missing. Based upon these observations, Deputy Roberts prepared and executed an inmate movement request, explaining "I/M [inmate] was moved to medical padded cell after finding cuts on inmate and he had removed the blade from his razor." During Gregory's stay in the medical unit, Nurses Adams, Colpitts, Kirchner, and James saw him. Gregory told Nurse Adams that someone else had taken the razor blade, but when she explained that a cavity search would be necessary, Gregory responded that he had flushed the razor blade. Nurse Adams noted that Gregory was alert; she later stated that he denied being suicidal, and that she observed nothing that led her to believe he would attempt suicide. Nurse Colpitts also observed Gregory and told Nurse James that she had no concerns about him being released from the medical unit. On the evening of April 22, Gregory refused his medications. After two days of observation, Gregory was released from medical segregation. Nurse James signed a movement request form that said Gregory "[n]o longer needs medical observation," but no additional reasons were given at the time. Deputy Schroeder executed the inmate movement request on April 23. He wasn't seen by a doctor, nor was someone from the Madison Center called before his  release.

Deputy Schroeder placed Gregory in disciplinary segregation after his release. No one made any interval checks on Gregory while he was in segregation, but the jail staff observed him at meal pass that evening and noted nothing out

13

of the ordinary. Nothing in the summary judgment record indicates that any medical personnel or guards checked on Gregory between dinner and 11:00 p.m., when Deputy Clifton reported a possible suicide. Deputy Clifton used the intercom to call Gregory, but when he received no response he went to Gregory's cell. Officer Kizer, Deputy Blanton, and Deputy Clifton discovered Gregory in his cell at 11:15 with a sheet around his neck. The officers removed the sheet and lowered Gregory to the floor. Nurse Riva arrived around the same time, followed by several guards. Neither the arriving medical personnel nor the guards checked for a pulse; no one tried to resuscitate Gregory.

As an initial matter, the County defendants say the Board of Commissioners of St. Joseph County are entitled to summary judgment on all claims because the County Commissioners don't have legal authority over the county jail. The court agrees. Under Indiana law, the county sheriff is charged with administering the county jail in a manner which preserves the safety of inmates, IND. CODE § 36-2-13-5(a), and "[i]t is well settled that Indiana Sheriffs are not subject to the control or authority of the County Commissioners of the county in which they hold office." Hupp v. Hill, 576 N.E.2d 1320, 1326 (Ind. Ct. App. 1991). The County Commissioners cannot be liable for any alleged wrongful conduct of Sheriff Canarecci or his Jail staff. *See* Estate of Drayton v. Nelson, 53 F.3d 165, 167 (7th Cir 1994) ("Marion County has no authority over the Sheriff and his deputies."); Broadus v. Beatty, 1995 WL 230339 * 2 (7th Cir. April 18, 1995).

14

Still, Ms. Minix says, the County Commissioners are liable for the acts and omissions of Memorial Home Care, Madison Center, and their respective employees because the County Commissioners contracted with these private entities to perform health care services at the county jail. The court disagrees. A municipal entity may not be held liable under § 1983 based on a theory of respondeat superior or vicarious liability, and Ms. Minix hasn't pointed to any evidence demonstrating Gregory's alleged constitutional deprivation occurred as the direct result of an express policy or custom of the County Commissioners. *See* Jackson v. Illinois Medi-Car, Inc., 300 F.3d 760, 766 (7th Cir. 2002).

Ms. Minix says the remaining defendants, through their deliberate indifference to Gregory's risk of suicide, violated his right to receive adequate medical supervision and care during his confinement. *See* Farmer v. Brennan, 511 U.S. at 832-834 (the Eighth Amendment imposes a duty on prison officials to ensure that inmates receive adequate food, clothing, shelter, and medical care, and requires that officials "take reasonable measures to guarantee the safety of the inmates"); Board v. Farnham, 394 F.3d 469, 477 (7th Cir. 2005) ("[T]he constitutional rights of a pretrial detainee are derived from the Due Process Clause of the Fourteenth Amendment . . . ."); Matos ex rel. Matos v. O'Sullivan, 335 F.3d 553, 556 (7th Cir. 2003); Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir. 2001); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 258 (7th Cir. 1996). Although the Eighth Amendment claim has been dismissed because it doesn't apply to pretrial detainees such as Gregory, detainees are entitled to as least as

15

much protection under the Fourteenth Amendment as convicted prisoners are under the Eighth Amendment. <u>Board v. Farnham</u>, 394 F.3d at 477-478. Indeed, the court of appeals has "found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) 'without differentiation.'" <u>Id</u> at 478 (quoting <u>Henderson v. Sheahan</u>, 196 F.3d 839, 845 n. 2 (7th Cir. 1999)).

To succeed on a § 1983 claim based upon a violation of the Fourteenth Amendment, a plaintiff must satisfy both an objective and subjective element: (1) the harm that befell the detainee was objectively, sufficiently serious, and a substantial risk to his health or safety, and (2) that the defendant was deliberately indifferent to the detainee's health and safety. <u>Collins v. Seeman</u>,462 F.3d at 760 (citing <u>Farmer v. Brennan</u>, 511 U.S. at 834). The parties don't dispute that the first prong is satisfied "since suicide is an objectively serious harm." <u>Matos ex rel. Matos v. O'Sullivan</u>, 335 F.3d at 557. At issue is whether the defendants were deliberately indifferent to the risk Gregory would commit suicide.

When the harm at issue is a suicide, deliberate indifference requires a showing that the defendant (1) subjectively knew the detainee was at substantial risk of committing suicide, and (2) intentionally disregarded the risk. <u>Collins v. Seeman</u>, 462 F.3d at 761 (citing <u>Matos ex rel. Matos v. O'Sullivan</u>, 335 F3d. at 557); <i>see also</i>  <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d 525, 529 (7th Cir. 2000). For the subjective component, "it is not enough that there was a danger of which a prison official should have been aware," rather, "the

16

official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exist, and he must also draw the inference." Collins v. Seeman, 462 F.3d at 761 (quoting Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 529). Liability doesn't attach where "the defendants simply were not alerted to the likelihood that [the detainee] was a genuine suicide risk." Id. (quoting Boncher ex rel. Boncher v. Brown County, 272 F.3d 484, 488 (7th Cir. 2001)). A plaintiff may establish subjective awareness of the risk by proof of the risk's obviousness. Estate of Cole by Pardue v. Fromm, 94 F.3d at 260.

*The County Employees' Deliberate Indifference*[7]

Officer Williams and Deputy Clifton say they are entitled to summary judgment on Ms. Minix's deliberate indifference claim because there isn't any evidence they subjectively knew Gregory was a substantial risk of committing suicide.  Ms. Minix points to the notes in Gregory's file that he was a suicide risk and that he was previously on suicide watch as evidence they were aware Gregory was suicidal. The court disagrees. Officer Williams and Deputy Clifton were on duty in disciplinary segregation on April 23, but that there was information in Gregory's medical files suggesting he was suicidal isn't sufficient to put them on notice that he posed a substantial and imminent suicide risk; rather, Ms. Minix

---

[7]While Ms. Minix sues Sheriff Canarecci in his individual capacity, she doesn't make any arguments, nor does the record support, that he was personally involved or acquiesced in some demonstrable way to the sort of treatment Gregory would receive, so the court grants Sheriff Canarecci's motion for judgment on her claim that he was deliberately indifferent in his individual capacity. Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003).

must come forward with evidence that these officers were aware of the information contained in those records. Collins v. Seeman, 462 F.3d at 761 n.2. There is no evidence that either guard knew about the information in Gregory's medical file. Furthermore, that Gregory was previously on suicide watch doesn't make the risk of suicide so obvious that subjective awareness of an imminent suicide risk could be inferred by a trier of fact. Collignon v. Milwaukee County, 163 F.3d 982, 990 (7th Cir. 1998) ("Placing a pre-trial detainee on some level of suicide watch, even the highest level, does not demonstrate a subjective awareness of a substantial risk of imminent suicide."). Officer Williams and Deputy Clifton are entitled to summary judgment on the claim they were deliberately indifferent to Gregory's health and safety.

Ms. Minix also says several guards and Warden Grah were deliberately indifferent to Gregory's health and safety by not attempting to revive Gregory upon discovering him not breathing in his cell. The court disagrees. These defendants are non-medical personnel who generally can defer reasonably to the medical professionals' opinions and are often justified in believing a detainee is receiving the necessary and proper medical treatment. Johnson v. Doughty, 433 F.3d 1001, 1010-1011 (7th Cir. 2006); Greeno v. Daley, 414 F.3d 645, 656 (7th Cir. 2005); Bond v. Aguinaldo, 228 F. Supp. 2d 918, 920 (N.D. Ill. 2002). Officer Kizer testified that he, Deputy Blanton, and Deputy Clifton discovered Gregory seated with a sheet tied around his neck; the officers removed the sheet and lowered Gregory to the floor. Officer Kizer described Gregory as being "bluish," "discolored", and

18

"stiff," so he radioed his supervisor and the nursing staff. Deputy Clifton testified that Nurse Riva had arrived by the time they had removed the sheet—Deputy Kovach, Officer Huber, Officer Orr, Officer Hahn, Sergeant Johnson, and Warden Grah arrived sometime after. Upon examining Gregory, Nurse Riva declared him beyond C.P.R. Nothing in the record suggests that it was unreasonable for these non-medical defendants to rely on the judgment of Nurse Riva, so the court cannot say a jury could find these defendants acted with deliberate indifference towards Gregory. *See, e.g.,* <u>Johnson v. Doughty</u>, 433 F.3d at 1011-1012 (non-medical official responded reasonably where he "investigated the situation, made sure that the medical staff was monitoring and addressing the problem, and reasonably deferred to the medical professionals' opinions").

Ms. Minix says Deputy Workman, Deputy Schroeder, and Warden Grah were deliberately indifferent by classifying Gregory for disciplinary segregation on April 23, but the court cannot agree. Even if Ms. Minix could establish Deputy Workman and Warden Grah were aware that Gregory was an imminent suicide risk on April 23 (which she can't), there is no evidence in the record that they were personally involved in the decision to transfer Gregory to disciplinary segregation. Both testified (and the inmate movement request form confirms) that Deputy Schroeder was the classification officer involved in the decision to transfer Gregory to disciplinary segregation, so neither Deputy Workman nor Warden Grah is liable under § 1983. <u>Palmer v. Marion County</u>, 327 F.3d at 594 ("In addition to the element of deliberate indifference [ ], § 1983 lawsuits against individuals require

personal involvement in the alleged constitutional deprivation to support a viable claim.").[8]

Deputy Schroeder's conduct doesn't demonstrate a sufficiently culpable state of mind. Like the other officers, Deputy Schroeder wasn't a medical professional. She testified to interviewing Gregory and speaking with Nurse Laz and Nurse Erin as part of his initial classification. These discussions, however, took place contemporaneous with Gregory's initial classification on March 24. Over the next month, Gregory twice was sent to the medical unit and released by the nursing staff. Deputy Schroeder testified that a release from medical unit indicated the nursing staff didn't believe a detainee to be a suicide risk:

> [T]he medical [staff] is the one to make the determination of being released from suicide watch. Once they have made that determination and decision, then their word is — that means they're okay. . . . The nursing staff made the decision that he was not a suicide risk and they release him. So at that point, that means he's not a suicide risk, so he's not going to be treat any different than anybody else in the jail.

There isn't anything in the record that suggests it was unreasonable for her to rely on the nursing staffs' determination that Gregory wasn't suicidal on April 23, so the court cannot say she was deliberately indifferent towards his health and safety by subsequently assigning him to disciplinary segregation. *See, e.g.,* Johnson v. Doughty, 433 F.3d at 1011-1012.

---

[8]Deputy Workman testified that she and Deputy Schroeder discussed Gregory being a "high risk" with Warden Grah in March, but to hold the Warden liable in his supervisory capacity, there must be some evidence that he knew Gregory was being transferred to disciplinary segregation on April 23 and that the Warden inferred from that transfer that there was a substantial risk of serious harm to Gregory. Palmer v. Marion County, 327 F.3d at 594.  Ms. Minix hasn't pointed to any evidence Warden Grah was subjectively aware of the risk Gregory faced in disciplinary segregation.

*Memorial Employees' Deliberate Indifference*

Ms. Minix says Dr. David was deliberately indifferent to the risk Gregory would commit suicide by failing to assure that he received proper mental health treatment. Dr. David was director of the medical unit at the St. Joseph County Jail and so was charged with implementing the Jail's medical health policies, which included the Jail's policy on suicide prevention.[9] Ms. Minix hasn't presented evidence that Dr. David made the decision to transfer Gregory from suicide watch, so he is liable for this decision only if there is evidence it resulted from an unconstitutional practice, of which he was aware and facilitated or condoned. Palmer v. Marion County, 327 F.3d at 594 ("Although direct participation is not necessary, there must at least be a showing that the Sheriff acquiesced in some demonstrable way in the alleged constitutional violation."); Jones v. City of Chicago, 856 F.2d 985, 992-993 (7th Cir. 1988)("[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.").

Dr. David approved Gregory's Paxil, BuSpar, and Depakoto prescriptions and was aware Gregory had recently been in the custody of Richmond State Hospital, yet he did not interview or examine Gregory before his release from the

---

[9]The Medical Director Services Agreement required physicians to perform medical services in compliance with "all relevant federal and state laws, regulations and standards governing the practice of medicine and those governing the facility." Indiana's Administrative Code requires that "[a] duly licenced physician shall be responsible for medical services in each jail." 210 IAC 3-1-11.

medical unit or suicide watch. Dr. David testified that Madison Center personnel would have evaluated a detainee with Gregory's history of mental illness and prescriptions, yet he didn't understand the procedures for referring detainees for a mental health assessment. Dr. David explained that his lack of direct contact with Gregory was because the nursing staff never deemed it important to contact him before releasing Gregory from medical unit. Dr. David's testimony would allow a trier of fact to reasonably conclude he had notice of the substantial risk of suicide created by allowing the nursing staff to classify Gregory for purposes of suicide watch without psychological evaluation or assessment, and that he condoned the delegation of this authority. *See* Mombourquette ex rel. Mombourquette v. Amundson, 469 F. Supp. 2d 624, 653 (W.D. Wis. 2007).

A plaintiff can show that a professional disregarded a serious medical need "only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." Collignon v. Milwaukee County, 163 F.3d at 989. Deliberate indifference to a risk of suicide may be established by demonstrating that a supervisor failed to properly delegate responsibility for suicide assessments. *See, e.g.,* Mombourquette ex rel. Mombourquette v. Amundson, 469 F. Supp. 2d at 653; *see also* Rhyne v. Henderson County, 973 F.2d 386, 395-396 (5th Cir.1992) (Goldberg, J., concurring) ("vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs

22

of mentally ill detainees"); <u>Estate of Cills v. Kaftan</u>, 105 F. Supp. 2d 391, 402-403 (D. N.J. 2000) (failure to have suicide assessments conducted by someone with psychiatric training). Dr. David says it is his "professional opinion, [that] it was not necessary for Jeanne James, R.N. to first consult [him] or another physician before approving the release of Gregory Zick from the medical unit in late March and in April . . . [t]he decisions were matter of nursing judgment." Dr. Leenaars disagrees; he says the decision to take a detainee off suicide watch is beyond the scope of education and training of the nursing staff employed at the Jail in April 2003, so Dr. David had an "obligation to correct this intolerable situation."

Mere differences of opinion among medical personnel regarding a patient's appropriate treatment normally doesn't give rise to deliberate indifference, <u>Estate of Cole v. Fromm</u>, 94 F.3d at 261, but the court of appeals has recognized that it is inappropriate for unqualified nurses to make suicide classification without consulting a physician or psychiatrist. <u>Id.</u> at 263. Notwithstanding Dr. David's assessment of his decision to delegate the classification of detainees to the Jail nurses, the summary judgment record contains evidence that would permit a jury to find his decision wasn't based on any such professional judgment. Dr. David says it was appropriate for Nurse James and the other nurses to make decisions regarding detainees suicide risk classification, (which it could be in certain cases) but he testified in his deposition that he didn't have any knowledge of the specific training they went through for purposes of assessing suicide risks. Dr. House opined that it was common to involve a psychiatrist to help determine whether a

detainee is a suicide risk, but Dr. David testified that he hadn't seen the policy, nor did he understand the procedures, for referring detainees to the Madison Center for evaluations. Dr. David also stated that no Madison Center employee had ever contacted him about a mental health issue with an inmate. It also doesn't appear from Dr. David's testimony that he had any understanding of the official policy and procedure for changing a detainee's suicide classification. If the jury believes Dr. Leenaars's assessment of the medical unit under Dr. David's tenure, it could find reasonably that he was deliberately indifferent to a risk that an inmate like Gregory would seriously harm himself.[10]

Ms. Minix says Nurse James was deliberately indifferent to Gregory's health and safety when she released him from suicide watch without further psychological evaluation. Nurse James says her determination that Gregory no longer needed medical observation should be viewed under the professional judgment standard, but the court disagrees. "[T]he professional judgment standard only applies to decisions made by professionals such as physicians, psychiatrists, and nurses *within their area of professional expertise*," while "the deliberate indifference standard [ ] applies to the decisions of prison medical

---

[10] Ms. Minix also says Dr. David should have reviewed Ms. Lonz's credentials in accordance with the Jail's policy, which stated "the jail doctor will be responsible for planning and developing adequate staffing for health care programs . . . [ ] Memorial Home Care will verify with the state licensure status of every health care provider before hiring or granting approval for that person to work in the jail." Assuming this policy created some duty for Dr. David to review the qualifications of Madison Center personnel, deliberate indifference cannot be inferred solely from a violation of jail policy. *See, e.g.*, J.H. ex rel. Higgin v. Johnson, 346 F.3d 788, 793 (7th Cir. 2003). Dr. David testified that he believed the Madison Center was responsible for checking the credentials of those persons providing mental health assessments, and the court cannot find his decision not to check Ms. Lonz's amounts to deliberate indifference.

24

personnel as to what medical care a prisoner requires." <u>Collignon v. Milwaukee</u> <u>County</u>, 163 F.3d at 989 (emphasis added). Nurse James's expertise wasn't in the psychological evaluation, treatment, or medication of mentally ill individuals, nor did she prepare a written report or otherwise document the medical basis for her decision to return Gregory to general population. This case isn't like <u>Estate of Cole</u> <u>by Pardue v. Fromm,</u> where there was difference of opinion between two psychiatrists, one of whom had conducted mental health examinations of the detainee, 94 F.3d at 261, so the court doesn't apply the professional judgment standard to Nurse James's decision to release Gregory from the Jail's medical unit.

Still, Nurse James's actions don't amount to deliberate indifference because no reasonable jury could find, in light of Gregory's comments that he wasn't suicidal, she was subjectively aware that he was an imminent suicide risk. *See* <u>Matos ex rel. Matos v. O'Sullivan</u>, 335 F.3d at 557 (holding there wasn't sufficient evidence the defendants were subjectively aware a prisoner was a suicide risk when he denied feeling suicidal or depressed, and because the risk of suicide wasn't obvious despite expert opinions to the contrary). Ms. Minix's expert psychiatrist and physician claim the risk of suicide was clearly present, but what is "obvious to a professional acting within [his] area of expertise," wouldn't necessarily be obvious to Nurse James. <u>Collignon v. Milwaukee County</u>, 163 F.3d at 989. Likewise, Nurse Adams and Nurse Wade both observed Gregory in the medical unit from April 21 through April 23, but there is no evidence that either

25

nurse was qualified to psychologically evaluate him. They testified that he was alert, polite, and denied being suicidal, so the court cannot say there is sufficient evidence they were subjectively aware that he was an imminent suicide risk. *See* Matos ex rel. Matos v. O'Sullivan, 335 F.3d at 557.

Ms. Minix says Nurse Gore, Nurse Erin, and Nurse Laz also were deliberately indifferent to Gregory's health and safety when they failed to inquire further into to his mental health or obtain his medical records from Richmond State Hospital. She hasn't pointed to any evidence in the summary judgment record of Nurse Gore's involvement with Gregory, and Nurse Erin and Nurse Laz only evaluated Gregory during his initial classification, and neither believed he was a suicide risk. Even if Ms. Minix could show these nurses were subjectively aware that Gregory was an imminent suicide risk, he was sent to the medical unit twice after they evaluated him, and both times it was determined that he wasn't a suicide risk. Nothing in the record indicates that Nurse Gore, Nurse Erin, or Nurse Laz observed him during either period in the Jail's medical unit, nor is there any evidence they were involved the decision to transfer Gregory out of the medical unit on April 23, so no reasonable fact-finder could say these defendants were personally involved in the alleged deprivation of medical care that resulted in Gregory's death. *See* Palmer v. Marion County, 327 F.3d at 594.

Finally, Ms. Minix says Nurse Kirchner and Nurse Conn were deliberately indifferent to Gregory's health and safety when they failed to initiate C.P.R. upon arriving at Gregory's cell on April 23. Both Nurse Kirchner and Nurse Conn

received C.P.R. training pursuant to the Jail's medical emergencies policy, and a trained professional's decision to administer C.P.R. is a particular course of treatment, which is subject to the professional judgment standard. *See, e.g.,* Steele v. Choi, 82 F.3d 175, 179 (7th Cir. 1996). Dr. Stevens concluded that it was an "error in judgment . . . when the jail staff, upon finding Gregory hanging, did not immediately begin CPR as per their policy." Dr. House opined to the contrary. After reviewing the evidence of the events of April 23—a video tape indicating Gregory was found in a "very unnatural position," Nurse Kirchner's testimony that Gregory was found "sitting upright" and was "very, very gray," and Nurse Conn's testimony that has extremities had a bluish color—Dr. House concluded rigor mortis had begun, so any attempt to perform C.P.R. would have certainly failed. Dr. House testified that Nurse Kirchner should have checked Gregory's pulse, but the court cannot say the differences in the doctors' opinions permits a trier of fact to conclude the nurses' decision not to initiate C.P.R. was a substantial departure from accepted professional judgment. *See* Estate of Cole v. Fromm, 94 F.3d at 261 ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.").

*Municipal Defendants' Deliberate Indifference*

Ms. Minix says "Sheriff [Canarecci], Warden [Grahl], Dr. David, [Nurse] James, Memorial Home Care, and Madison Center through their lack of policies, and failure to train and implement policies, acted with deliberate indifference to

Greg's right to be free from cruel and unusual punishment."[11] She sues Sheriff Canarecci and Warden Grahl in their official capacities, so her claim is against the county's official decision-maker in matters involving the Jail, which in this case would be Sheriff Canarecci. <u>Luck v. Rovenstine</u>, 168 F.3d 323, 326 (7th Cir. 1999)(citing INDIANA CODE § 36-2-13-5(a)). She also sues Dr. David and Nurse James in their official capacities, so her claim is against the municipal entity for which they are agents—Memorial Home Care. <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).[12]

A municipal entity violates a detainee's constitution rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." <u>Woodward v. Correctional Medical Services of Illinois, Inc.</u>, 368 F.3d at 927 (quoting <u>Payne v. Churchich</u>, 161 F.3d 1030, 1043 (7th Cir. 1998)); <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d at 530. The policy or practice must be the "direct cause" or "moving force" behind the constitutional violation. <u>Estate of Novack ex rel. Turbin v. County of Wood</u>, 226 F.3d at 530; *see also* <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 691 (1978). Ms. Minix can demonstrate that Sheriff Canarecci or

---

[11]The court already determined in its November 1, 2006 order there wasn't sufficient evidence to permit a rational jury to reasonably conclude the Madison Center through it policies or customs was deliberately indifferent to Gregory's medical needs.

[12]For purposes of § 1983, a private corporation acting under color of state law is treated as though it were a municipal entity. <u>Jackson v. Illinois Medi-Car, Inc.</u>, 300 F.3d at 766 n.6. The parties don't dispute for purposes of this motion that Memorial Home Care was acting under color of state law as a contractor providing medical, dental, and psychiatric services to detainees. As such, it is treated the same as a municipality for purpose of § 1983. *See* <u>Woodward v. Correctional Medical Services of Illinois, Inc.</u>, 368 F.3d 917, 927 n.1 (7th Cir. 2004).

Memorial Home Care caused a constitutional injury either "directly by demonstrating that the policy itself is unconstitutional" or "indirectly 'by showing a series of bad acts and inviting the court to infer from them that the policymaking level [ ] was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers.'" Estate of Novack ex rel. Turbin v. County of Wood, 226 F.3d at 531 (quoting Jackson v. Marion County, 66 F.3d 151, 152 (7th Cir. 1995)). Deliberate indifference to a detainee's medical needs also may be proven by showing "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." Holmes v. Sheahan, 930 F.2d 1196, 1200 (7th Cir. 1991).

Ms. Minix says there weren't "reasonable policies in place to assure appropriate procedures with detainees/inmates at risk for suicide." The St. Joseph County Jail had a policy in 2003 addressing suicide prevention, so the court understands her claim to be, at least in part, that the alleged omissions in these policies deprived Gregory of adequate care. The summary judgment record would allow such a finding.

Ms. Minix specifically complains that "no psychiatrist came to the Jail and at the time [ ] physicians did not regulate suicide watch." The Jail's policy dealing with suicide prevention provided in part that:

The assessment of the inmates that are designated to possibly be suicidal is done by the nurse at the first available time. This will involve an interview

and observation of the individuals behavior in the housing unit. After the assessment is done, the lethality and suicide potential of the individual will be assesed (sic) and the appropriate precautions will be assigned and taken to ensure the safety of the individual. A call will be placed to Madison Center emergency intake staff for evaluation.  Monitoring of the possible suicidal individual will be done continuously by the housing officer. Periodic checks will also be conducted by the health care staff. . . .  Status levels may change at any time at the discretion of the supervisor, nursing staff, or Jail Doctor. It will be reviewed by two of the following when removed. Jail Doctor, nurse, classification, or Madison center personnel.

Despite this policy, there is enough evidence that a jury could conclude the actual practice (as opposed to the written policy) of classifying detainees for the medical unit and suicide watch was so inadequate that Sheriff Canarecci and Memorial Home Care were on notice when Gregory was being held that there was a substantial risk that he would be deprived adequate medical care. *See* Woodward v. Correctional Medical Services of Illinois, Inc., 368 F.3d at 927.

"Treatment of the mental disorders of mentally disturbed inmates is a 'serious medical need.'" Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983). An on-site psychiatrist isn't necessarily required since a jail may reasonably refer detainees to outside facilities for mental health assessment and treatment. *See, e.g.,* Madrid v. Gomez, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). Under the St. Joseph County Jail's mental health referral system, Madison Center personnel assessed inmates, and those detainees determined to be mentally impaired could receive treatment on an out-patient basis at the Madison Center. Still, correctional facilities have an obligation to staff individuals who are qualified to identify, evaluate, and treat psychiatric emergencies such as suicide, *see* Wellman v. Faulkner, 715 F.2d 269, 272 (7th Cir. 1983), and the determination that a

30

detainee should be released from suicide watch cannot be made without appropriate supervision and periodic psychological evaluation. *See* Estate of Cole by Pardue v. Fromm, 94 F.3d at 263; Rhyne v. Henderson County, 973 F.2d at 395-396 (Goldberg, J., concurring); Madrid v. Gomez, 889 F. Supp. at 1258 ("Psychotropic or behavior-altering medication should only be administered with appropriate supervision" and there "should be a basic program to identify, treat, and supervise inmates with suicidal tendencies."); Balla v. Idaho State Bd. of Corrections, 595 F. Supp. 1558, 1577 (D.C. Idaho 1984) (same). As discussed, this means the assessment of suicide risks is most appropriately made by a licensed psychiatrist, and it is inappropriate to implement a practice whereby personnel without appropriate psychiatric training can change a detainee's suicide classification without consulting a physician or psychiatrist. Estate of Cole by Pardue v. Fromm, 94 F.3d at 263.

In 2003, Nurse James and other members of the nursing staff (including Nurse Adams, Nurse Wade, and Nurse Colpitts) classified detainees for suicide watch. No Madison Center psychiatrist was consulted before inmates were classified, and there is little evidence of any connection between a detainee's psychological evaluation and his transfer from suicide watch. Nurse James explained the usual procedure of classifying inmates as follows:

> Usually the nurses that are on all talk about it and if anybody has any report that wasn't in the nurse's notes that we look at to see what's going on. So we would [ ] look[ ]at the previous records and if anybody has any other information, if we've been given a report by, say, one of the jail deputies and if the person has told the nurse that they're not suicidal, then we take them

off and they would come to me with this information and I would sign it then take it over to classifications.

Nurse James testified she could have relied on a Ms. Lonz's assessment in releasing Gregory, but wasn't required to, and there was no effort to obtain his prior hospital records. There was no policy promulgating the materials to be reviewed when classifying detainees, nor any procedures for insuring a detainee's mental health treatment process was accurately recorded and maintained.[13]

This informal practice also appears to have caused a lack of supervision by the attending physicians. Dr. David testified that the nursing staff sometimes would seek a  physician's input, but only if the nurse deemed such input as important or if the nurse already had determined a detainee to be suicidal. Otherwise, a nurse could remove a detainee from suicide watch without a physician's signature. Dr. David testified that he wasn't familiar with the procedures for referring detainees to the Madison Center and had never communicated with a Madison Center employee about an inmate. Even more problematic, Ms. James testified that once the nursing staff recommended a detainee's transfer from suicide watch, the ultimate decision rested with the

---

[13]These findings aren't inconsistent with the court's previous determination that the alleged omissions in Madison Center policies for assessing detainees mental health didn't rise to the level of "systemic and gross deficiencies," such that detainees were effectively denied access to adequate medical care. Christine Lonz testified that she would inform the Jail medical staff of her assessments and that Madison Center personnel could even make recommendations as monitoring and observation of detainees. There is little evidence, however, that the Jail staff considered this information when classifying inmates. Indeed, the Madison Center's role in providing mental health care was limited to making an assessment the nurses presumably would rely upon, and there isn't sufficient evidence of a widespread practice of detainees being improperly assessed or treated by Madison Center personnel such that a trier of fact could infer Madison Center was condoning a policy of misconduct in providing mental health services. *See* Doc. No. 97, pg 16-21.

classifying officer. Although some nurses may be qualified to make assessments about suicide risks, the defendants haven't pointed to any evidence that Nurse James, Nurse Adams, or Nurse Coplpits, let alone the classifying officers, were qualified to make the necessary psychological evaluation before removing a detainee from suicide watch. Nurse James testified that she took the required psychiatric classes during her nursing education, but Dr. Leenaars opined that the decision to take a detainee off suicide watch is beyond the scope of education and training of the nursing staff employed at the Jail in April 2003. A rational jury reasonably could find the practice of classifying inmates constitutes such a systemic and gross deficiency in suicide prevention, staffing, and procedures that the detainees were effectively denied access to adequate medical care. *See* Estate of Cills v. Kaftan, 105 F. Supp. 2d 391, 402-403 (D. N.J. 2000) (finding the verbal suicide policy in effect at the time of the inmate's incarceration was Constitutionally deficient because the decision to remove an inmate from suicide watch was made by senior staff members who had no specific psychiatric training).

There also is enough evidence to allow a jury to find a direct causal link between the Jail's practice of classifying and releasing detainees from suicide watch and Gregory's suicide. Dr. David stated that he "didn't have control as far as saying [ ] [Gregory] needed to be in suicide watch or he didn't need to be in suicide watch"; rather, the decision was made by Nurse James, who was aware of Gregory's prior suicide attempts, but because he denied having any current

suicidal thoughts, didn't believe he was an imminent suicide risk. As a result, Nurse James didn't contact Dr. David (or any other physician for that matter) or anyone at the Madison Center before deciding to transfer Gregory out of suicide watch on April 23.

As discussed, Nurse James wasn't trained to psychologically evaluate or treat detainees for suicide risks, and if a jury accepts the opinions of Dr. Leenaars and Dr. Stevens, an individual with the proper training would have recognized Gregory as suicidal.[14] Nurse Hayes testified that once the decision is made to take a detainee off suicide watch, as it was with Gregory, that detainee is observed at the same level as other inmates. Had Gregory remained on suicide watch, the Jail's policy would have required that he be monitored at least every 15 minutes. There is sufficient evidence of a direct connection between the Jail's practice of evaluating and releasing detainees from suicide watch and Gregory's death for the jury to hold the municipal defendants liable.[15]

---

[14]Dr. Leenaars stated "[i]t is well know that suicide, in a case like Gregory Zick can be predicted and prevented," since "one of the best predictors for suicide risk is a previous attempt." Dr. Stevens explained that Nurse James erred by "not tak[ing] into account all the [ ] factors occurring in those last few days . . . not seeing the increased risk of suicide. . ." While a psychiatrist such as Dr. Leenaars and a physician like Dr. Stevens may have received the training to recognize the critical factors in predicting suicides, Nurse James hadn't received such training.

[15]Ms. Minix also says there is inadequate policies for CPR training. The court disagrees. The Jail's policy on Medical Emergencies provided that, "correctional and other personnel are trained to respond to health-related situations within four minute response time," and that "[t]raining will be provided for jail personnel that will cover at minimum the following . . ." "recognition of signs and symptoms and knowledge of action required in emergency situations," and "administration of first aid and CPR." This policy doesn't amount to "systemic and gross deficiencies" in medical emergency procedures and training. Nurse Kirchner say she wasn't taught to do C.P.R. if the person "had been gone too long," but Nurse Maure testified she had no discretion in not administering C.P.R. to a person who is not breathing. There isn't any evidence that the actual practice of administering C.P.R. was so inadequate that either Sheriff Canarecci or Memorial Home

34

Ms. Minix also points to alleged unlawful acts by employees towards Gregory, but her claim doesn't present a prototypical situation of a "widespread practice" because there isn't evidence of the Jail's suicide prevention practices being applied to other detainees. *See* <u>Phelan v. Cook County</u>, 463 F.3d 773, 789 (7th Cir. 2006). She says Gregory wasn't observed while on disciplinary segregation in accordance with the Jail's policies, and the responding officers didn't properly initiate life saving procedures. A reasonable jury might infer the existence of a policy or custom through the repeated actions towards one detainee who commits suicide, <u>Id.</u>, but Ms. Minix still must introduce some evidence demonstrating that the unlawful practice was so pervasive that policymakers' acquiescence was apparent and amounted to a policy decision. There is no evidence of a widespread practice of officers failing to properly observe inmates in disciplinary segregation or improperly administering C.P.R., so the municipal defendants are entitled summary judgment on her § 1983 deliberate indifference claim to the extent she seek to hold them liable for the actions of the officers.

*State Law Claims*

The Memorial and County defendants request that the court relinquish supplemental jurisdiction over the plaintiffs' state law claims against them if summary judgment is entered on the federal constitutional claims. The court

---

Care were on notice here was a substantial risk that Gregory would be denied adequate life saving procedures.

declines, since a federal claim arising out of the same set of facts as the state law claims continues to pend against Dr. David in his individual capacity, Memorial Home Care, and Sheriff Canarecci in his official capacity. *See* 28 U.S.C. § 1367(c); *see also* <u>Groce v. Eli Lilly & Co.</u>, 193 F.3d 496, 500-501 (7th Cir. 1999). The Madison Center and Christine Lonz have renewed their request that the court relinquish jurisdiction over the state law claims against them because they say the court has dismissed all claims against them over which it has original jurisdiction. The plaintiffs haven't had an opportunity to respond to the renewed motion, so the court declines to address it at this time and directs the plaintiffs to respond within the time period provided by Northern District of Indiana Local Rule 7.1.[16]

CONCLUSION

For the foregoing reasons, the Memorial defendants' motion for judgment on the pleadings [Doc. No. 90] is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED with respect to Ms. Minix's equal protection claim, and her claim for loss of continued familial relationship. It is DENIED with respect her due process claims. The defendants' summary judgment motions [Doc. Nos. 113 & 123] are GRANTED IN PART AND DENIED IN PART. Both motions are GRANTED, with the exception that Ms. Minix's deliberate indifference claim against Sheriff Canarecci, Jr. in his official capacity, Dr. David in his individual capacity, and

---

[16]The court also notes the pending motion to strike certain opinions of Dr. Peter Gutierrez, but because the court didn't rely on Dr. Gutierrez's report in ruling on these motions for summary judgment, it declines to address the motion at this time. If Mr. Gutierrez's potential testimony is still at issue, the court will address this motion at the final pre-trial conference.

Memorial Home Care continues to pend, and the court also continue to exercise supplement jurisdiction over the state law claims. The Memorial defendants' objection to Ms. Minix's motion for leave to amend is OVERRULED AS MOOT; their motion to strike [Doc. No. 136] is DENIED AS MOOT.

SO ORDERED.

Dated:   July 3, 2007

_____/s/ Robert L. Miller, Jr._____
Chief Judge
United States District Court